# In the United States Court of Federal Claims

No. 12-321C

(Filed: October 27, 2016)

| | | |
|---|---|---|
| ************************************* | * | |
| | * | |
| LCM ENERGY SOLUTIONS, | * | |
| | * | |
| Plaintiff, | * | Section 1603 of American Recovery and Reinvestment Act; Determination of Cost Basis; Forfeiture of Fraudulent Claims Act; False Claims Act. |
| v. | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| ************************************* | * | |

*John C. Hayes, Jr.,* with whom was *Brian P. Donnelly,* Nixon Peabody LLP, Washington, D.C., for Plaintiff.

*Meen Geu Oh,* with whom were *Benjamin C. Mizer,* Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, *Steven J. Gillingham,* Assistant Director, and *Nathanael B. Yale,* Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

This case arises under the American Recovery and Reinvestment Act ("ARRA"), a statute that Congress enacted in February 2009 to provide a fiscal stimulus to the nation's ailing economy. Section 1603 of ARRA was designed to encourage the development of renewable energy systems. Pub. L. No. 111-5, Div. B, tit. I, § 1603, 123 Stat. 115, 364. The Court has subject matter jurisdiction of this case because ARRA is a money-mandating statute for purposes of the Tucker Act, 28 U.S.C. § 1491(a)(1). ARRA Energy Co. I v. United States, 97 Fed. Cl. 12 (2011).

Under Section 1603, an eligible party may claim a 30 percent cash rebate of the basis of qualifying renewable energy systems, such as solar panel systems, windmill farms, and biomass energy facilities, among others. The Treasury Department administers the

Section 1603 program with the assistance of the Department of Energy's National Renewable Energy Laboratory ("NREL").  Here, Plaintiff LCM Energy Solutions ("LCM") submitted claims for 18 solar panel systems placed in service in the vicinity of Dallas and Fort Worth, Texas during 2010 and 2011.  LCM asserts that the Treasury Department improperly reduced the amount of the cash rebate to which it is entitled, and owes LCM the disallowed portion of the claims, $407,134.  The Treasury Department paid LCM $482,504.

The Government has a diametrically different view of the case, maintaining that LCM is not entitled to any additional compensation, and in fact must return all of the funds it received, plus applicable fines and penalties, due to LCM's allegedly fraudulent activities.  The Government's position is that LCM committed fraud against the United States by knowingly submitting false claims for Section 1603 cash rebates.  The Government contends that LCM was not an eligible party to submit any cash rebate claims, and that LCM intentionally deceived the Treasury Department about the nature of its transactions, portraying them as leases instead of sales.  The Government also alleges that LCM's customers for the solar panel systems paid little, if any, money for these systems, regardless of whether the transactions were leases or sales.  If fraud is proven, the Government asserts that LCM forfeited its claims against the United States under 28 U.S.C § 2514, the Forfeiture of Fraudulent Claims Act, and that LCM must repay the amount received on its cash rebate claims at a treble damages rate, plus the statutory penalty amount for 18 separate false claims, under 31 U.S.C § 3729(a), the False Claims Act.

The Court conducted a four-day trial in Washington, D.C. during April 26-28, and May 6, 2016.  The Court received the testimony of Edward Methvin and David Perez, the owners of LCM, Ellen Neubauer from the Treasury Department, Edward Settle from NREL, Michael Stockard from Oncor (a Texas utility company), and the various LCM customers who acquired the solar panel systems.  On May 6, 2016, three of the LCM customers and Mr. Stockard testified by video conference from Texas.  The Court received post-trial briefs from the parties on July 25, 2016 and September 16, 2016, and heard closing arguments on October 6, 2016.

Findings of Fact

A.  <u>Background of the Section 1603 Program</u>

Congress passed the American Recovery and Reinvestment Act of 2009 in the face of a well-publicized economic downturn.  PX 34 at 2; Neubauer, Tr. 458-59.  ARRA was a Congressional effort to "preserve and create jobs" and encourage investment in infrastructure that Congress hoped would "promote economic recovery in the near term," "provide long-term economic benefits" to the American people, and to "assist those most impacted by the recession."  <u>Id.</u>  To achieve these objectives, among other things, Congress

tasked the Treasury Department with implementing a renewable energy incentive program promulgated under Section 1603 of ARRA to encourage businesses to invest in and develop renewable energy. Id. Instead of receiving a tax credit, the Section 1603 program created a mechanism for businesses to receive direct payments for placing in service certain renewable energy projects. Id. Public funds were made available for a limited time to reimburse eligible applicants for a portion of the expenses of such property. Id. For solar energy systems, the reimbursement amount was 30 percent of the cost basis of the systems. PX 34 at 5.

To establish the eligibility requirements under the program, Treasury published a program guidance document explaining the criteria that applicants had to meet in order to receive payment. PX 33 at 1 ("Terms and Conditions"). If applicants had questions about the program, they could communicate with Treasury at an email address established for this purpose, 1603Questions@do.treas.gov. PX 34 at 2; Neubauer, Tr. 498-99. Applicants were required to "maintain project, financial, and accounting records sufficient to demonstrate that Section 1603 funds were properly obtained in accordance with the Section 1603 program." PX 33 at 2.

The Section 1603 application form was an online questionnaire consisting of seven sections. Applicants could complete the online form and upload electronically the supporting documents. DX 80; Neubauer, Tr. 460-61; Settle, Tr. 571. The application form included information about applicant identity and eligibility, property description, cost basis, amount being claimed, supporting documents, and certification of the data. DX 80; Settle, Tr. 573-76; Neubauer, Tr. 460. Treasury entered into various interagency agreements with the Department of Energy's NREL to provide staff reviewers. The NREL representatives assisted in evaluating applications and making recommendations. Neubauer, Tr. 459-60; Settle, Tr. 568-69.

### B. The Formation of RCIAC

Edward Methvin and David Perez have been friends since 1988. Methvin, Tr. 47; Perez, Tr. 197. Mr. Methvin is a high school graduate with an Associate's Degree in auto body technology. Methvin, Tr. 41-42. Mr. Methvin has worked as an auto body painter, has owned an auto body shop, and has also worked as an electrician for several companies. Methvin, Tr. 42-44. He became a licensed master electrician in 2004 or 2005. Methvin, Tr. 41-42. He currently works as a project manager for an energy-saving company. Methvin, Tr. 40.

Mr. Perez is a high school graduate who attended college but did not graduate. Perez, Tr. 195. Mr. Perez worked as an operations manager in the credit card services branches of several banks from 1988 to 2009. His responsibilities included processing credit cards, applying payments to accounts, and customer service. Perez, Tr. 196. Mr.

Perez was laid off by J.P. Morgan Chase in November 2009.  Perez, Tr. 196.  Mr. Perez currently works as a production supervisor for a company that makes threaded metal products, such as bolts.  Perez, Tr. 195.

In 2007, Mr. Methvin formed a company called Right Choice Industrial Automation and Controls ("RCIAC").  Methvin, Tr. 41.  RCIAC initially was a sole proprietorship in the business of servicing industrial machinery.  Id.  After experiencing declining business, RCIAC shifted its focus to the efficient energy market, such as installing LED lighting and capacitor banks for business customers. Methvin, Tr. 44-45.  Mr. Perez joined RCIAC in January or February 2010.  Perez, Tr. 197.  Mr. Perez had no experience in the solar industry before joining RCIAC.  Perez, Tr. 198.

In February 2010, RCIAC became a corporation under the laws of Texas.  Methvin, Tr. 47-48; Perez, Tr. 198; PX 31.  Following incorporation, Mr. Methvin and Mr. Perez each owned 50 percent of RCIAC, and they were its sole directors.  Methvin, Tr. 48; Perez, Tr. 199-200; PX 31.  Within RCIAC, Mr. Methvin was responsible for field work, and Mr. Perez handled the administrative functions.  Methvin, Tr. 47.

### C. RCIAC's Entry Into the Solar Energy Business

RCIAC entered the solar energy installation business at the suggestion of its electrical materials supplier, a company called Gexpro.  Methvin, Tr. 48-49.  Gexpro was interested in starting a solar power division and needed a company to perform solar installations.  Methvin, Tr. 49.  RCIAC became interested in performing solar installations after Gexpro informed RCIAC about two incentive programs: the Section 1603 program, and a separate program run by Oncor, a Texas utility company.  Methvin, Tr. 49-50.  Mr. Methvin and Mr. Perez had no knowledge of the Section 1603 program until learning about it from Gexpro.  Methvin, Tr. 50.  After hearing about the Section 1603 and Oncor programs, RCIAC's Mr. Methvin and Mr. Perez carefully investigated both programs to determine whether they presented viable business opportunities.  Methvin, Tr. 54-56; Perez, Tr. 200.

Oncor is the electrical distribution company for the North Texas area.  Stockard, Tr. 664.  In 2010, Oncor ran a solar energy incentive program known as the "Take A Load Off Texas Solar Photovoltaic Program." Stockard, Tr. 665.  The Oncor program provided cash incentives to installers of qualifying photovoltaic systems.  Stockard, Tr. 665-66.  In order to qualify for these incentives, an installer had to be preregistered with the Oncor program. Id.  RCIAC was a preregistered installer.  Methvin, Tr. 52-53.  To receive an Oncor payment, the installer was required to submit a pre-application and a final application. Stockard, Tr. 666.  The purpose of the pre-application was to reserve an allotment of money from Oncor, which could only fund a limited number of projects on a first-come, first-served basis.  Methvin, Tr. 53-54; Perez, Tr. 212-13; Stockard, Tr. 672.  The pre-

4

application also informed Oncor that the proposed installation was served by an Oncor electrical meter, and otherwise met Oncor's requirements. Stockard, Tr. 666-72. The final application was submitted to Oncor after the solar installation was complete. Stockard, Tr. 666. After a final inspection, Oncor made the incentive payment to the installer. Id.

### D. RCIAC's Inquiries About the Section 1603 Program

Mr. Methvin and Mr. Perez reviewed Section 1603 guidance documents published by the Treasury Department and posed a number of questions to Treasury and IRS representatives by email and telephone. Methvin, Tr. 54-56; Perez, Tr. 201-06. Among other documents, Mr. Perez reviewed the statute and guidelines relating to the Section 1603 program. Perez, Tr. 201-04; PX 33-35. RCIAC asked Treasury how to determine its cost basis in a solar power system. Methvin, Tr. 56. Treasury informed RCIAC that it could not tell RCIAC how to determine its cost basis, but that RCIAC should use its own judgment and discretion for this purpose. Id.

Before undertaking any installations, RCIAC also inquired whether there was a maximum per watt amount it could submit as its cost basis. Methvin, Tr.56; Perez, Tr. 205-06. Treasury informed RCIAC that there was no maximum per-watt amount it could submit as its cost basis. Methvin, Tr. 56. RCIAC understood Treasury to mean that Treasury would respect RCIAC's submitted cost basis as long as RCIAC could justify the retail prices it charged for the solar power systems. Methvin, Tr. 90-91.

RCIAC also asked Treasury and IRS whether it would qualify for Section 1603 grants even if it provided purchase price rebates to its solar installation customers. Methvin, Tr. 54-55; Perez, Tr. 221-22. Treasury and IRS informed RCIAC that it would qualify for Section 1603 grants even if it provided purchase price rebates to customers, as long as the rebates were properly reported on tax returns. Id. RCIAC inquired whether there was a limit on the amount it could offer as a discount or price rebate. Perez, Tr. 221-22. Again, Treasury and IRS informed RCIAC that there was no limit in this regard, so long as it was properly reported on tax returns. Id.

RCIAC also asked Treasury whether residential installations would qualify for Section 1603 grants, if RCIAC leased the systems to residential end-users and RCIAC remained the owner. Methvin, Tr. 56; Perez, Tr. 638-40; PX 54. Treasury informed RCIAC that residential installations would qualify for Section 1603 grants, if RCIAC leased the systems to residential end-users and RCIAC remained the owner. Id. RCIAC inquired whether it would forfeit its right to a Section 1603 grant if residential end-users were given options to purchase the solar systems at the end of their lease terms. Methvin, Tr. 65; Perez, Tr. 638-40; PX 54. Treasury informed RCIAC that it would still qualify for Section 1603 grants as long as RCIAC maintained ownership of the systems for at least five years. Methvin, Tr. 65, 125-26; PX 33, 54. RCIAC understood Treasury to mean that

5

RCIAC could abandon the systems after five years and still qualify for Section 1603 grants. Methvin, Tr. 125-26.

### E. RCIAC's Pilot Solar System Installation

After gathering information about the Section 1603 program, RCIAC decided to perform a pilot installation to confirm whether its business plan was viable, and whether its understanding of the Section 1603 program was correct. Methvin, Tr. 57; Perez, Tr. 206-07. For its pilot installation, RCIAC installed a solar power system at Brandon Oaks, an apartment complex in Arlington, Texas. Id. Brandon Oaks was owned by Brett Heron, a third party unrelated to Mr. Methvin or Mr. Perez. Methvin, Tr. 58, 93; Perez, Tr. 207.

RCIAC placed the solar system in service at Brandon Oaks on July 6, 2010. PX 37 at 2. The size of this system was 39.025 kilowatts, or 39,025 watts. Methvin, Tr. 58-59; PX 37 at 3. RCIAC installed this power system to Brandon Oaks at a retail purchase price of $409,762.51, which equals a per watt retail price of $10.50. Methvin, Tr. 62-63, 93-94, 178-79; PX 37 at 4; DX 82 at 47. RCIAC determined the $10.50 per watt retail purchase price based upon retail pricing for the system's components and RSMeans data regarding average retail billing rates for electrical contractors in the Dallas-Fort Worth area. Methvin, Tr. 59-61, 78-79; Perez, Tr. 209; PX 14 at 14. The $10.50 per watt price also was consistent with market data that RCIAC observed on a Department of Energy website, which showed that the national average cost for solar energy systems was $10 to $10.50 per watt. Methvin, Tr. 59-60; Perez, Tr. 209-10. The installation of the Brandon Oaks system was an arm's length transaction between RCIAC and Mr. Heron. Methvin, Tr. 94.

RCIAC applied for and received an Oncor rebate for the Brandon Oaks system. Methvin, Tr. 59; Perez, Tr. 208-09. RCIAC also applied to the Treasury Department for a Section 1603 grant for the Brandon Oaks system. Id.; PX 37. In the Section 1603 application, RCIAC claimed the retail purchase price as the cost basis, which was $409,762.51, or $10.50 per watt. Methvin, Tr. 62-63, 93-94; Perez, Tr. 209; PX 37 at 3-4. RCIAC intended to deduct the amount of the Oncor rebate and the Section 1603 grant from the invoice price charged to Brandon Oaks. Perez, Tr. 400-01. A note on the RCIAC invoice to Brandon Oaks stated that "approved rebates" would be "deducted from invoice amount." DX 82 at 47. RCIAC submitted this invoice with the referenced note to Treasury in support of the Section 1603 grant application. Perez, Tr. 399-401.

Treasury approved the full amount of the Brandon Oaks Section 1603 grant. Methvin, Tr. 63; Perez, Tr. 210. The grant for the Brandon Oaks solar energy system corresponded to a per-watt cost basis of $10.50. Methvin, Tr. 63. Based upon Treasury's award of the full grant amount requested for the Brandon Oaks system, RCIAC concluded that its business plan was sound and that its understanding of the Section 1603 program requirements was correct. Methvin, Tr. 63; Perez, Tr. 210.

F.  RCIAC's Additional Solar Installations

Based upon Treasury's award of the full grant amount for the Brandon Oaks system, RCIAC decided to proceed with additional solar installations with the intent of applying for Section 1603 grants.  Methvin, Tr. 63, 94; Perez, Tr. 210, 214.  Between August 2010 and March 2011, RCIAC installed 18 solar systems on properties owned by Richard Owens, Mark Sanderlin, Paula Pence, Kozlovsky's Collision Repair, Steve Yoder, Richard Ray (eleven properties), Paul Haynes, and New Liberty Baptist Church.  Stip. ¶ 28.  Consistent with the advice it had received from Treasury, RCIAC intended to retain ownership of the systems and lease them to the end-users so its residential installations would qualify for Section 1603 grants.  Methvin, Tr. 56, 159; Perez, Tr. 638-40; PX 54.  The solar system installed at Kozlovsky's Collision Repair was for business use by an autobody shop.  Methvin, Tr. 85; Neubauer, Tr. 509-10.  Similarly, ten of the eleven solar systems installed at the properties owned by Richard Ray were for business use by Mr. Ray at rental properties.  Methvin, Tr. 85; Neubauer, Tr. 510-11.

The first two RCIAC installations after Treasury approved the Brandon Oaks grant were on residential properties owned by Richard Owens and Mark Sanderlin.  Methvin, Tr. 65; Perez, Tr. 214.  RCIAC retained ownership of these systems and leased them to Mr. Owens and Mr. Sanderlin.  Methvin, Tr. 65-66; Perez, Tr. 214-15; DX 81 at 25-29.  The term of both lease agreements was 60 months (five years).  Perez, Tr. 216; DX 81 at 25.  Under the RCIAC lease agreements, Mr. Owens and Mr. Sanderlin had the option to purchase the systems at the end of the lease term at fair market value or a price specified by RCIAC.  Perez, Tr. 218-19; DX 81 at 26.

G.  The Creation of LCM

In October 2010, RCIAC submitted Section 1603 grant applications to Treasury for the Owens and Sanderlin solar energy systems.  Stip. ¶ 7, 8; DX 80, 81.  After reviewing the Owens and Sanderlin applications, Treasury informed RCIAC that the installer and lessor of a solar panel system could not be the same entity and still qualify for a Section 1603 grant.  Methvin, Tr. 86, 129, 175-77; Perez, Tr. 219-20; DX 79; Neubauer, Tr. 513-15.  Upon receiving this information from Treasury, RCIAC contacted the IRS, which also told RCIAC that the installer and lessor had to be separate entities.  Perez, Tr. 221, 247-48.  RCIAC understood Treasury and IRS to mean that, in order for RCIAC's systems to qualify for Section 1603 grants, a separate entity had to be created to lease the systems installed by RCIAC.  Methvin, Tr. 129; Perez, Tr. 247-48.  After receiving this information, RCIAC withdrew the Owens and Sanderlin applications on October 23, 2010.  Stip. ¶ 10; Methvin, Tr. 86-87; Perez, Tr. 219, 240-41, 247.

7

Mr. Methvin and Mr. Perez, acting as directors of RCIAC, then held a meeting in which they decided to create LCM as a new entity to lease the RCIAC solar energy systems. PX 40. They determined that RCIAC would transfer to LCM title and leasing rights to the systems "in their existing state," and that "[t]ransfers of ownership and leases were handled verbally between RCIAC and LCM." Id. Mr. Methvin and Mr. Perez formed LCM on October 25, 2010. Stip. ¶ 11; PX 32, 40, 44. Mr. Methvin and Mr. Perez believed they were following Treasury's instructions when they formed LCM for the purpose of leasing the solar systems installed by RCIAC. Methvin, Tr. 129. If Treasury and IRS had not informed them that a separate entity was necessary to lease the systems installed by RCIAC, Mr. Methvin and Mr. Perez would not have formed LCM. Id. at 129, 132-33.

### H. Transfer of Ownership and Leasing Rights

After forming LCM based upon Treasury's advice, RCIAC transferred ownership of the 18 solar systems at issue in this case to LCM. Methvin, Tr. 156-59; Perez, Tr. 334-35; PX 7, 8, 40, 44. RCIAC also transferred its leasing rights in the systems to LCM. Perez, Tr. 323, 334-35; PX 40, 44.

LCM retained ownership of the 18 solar energy systems and leased them to the end-users. Methvin, Tr. 155-56, 159; Perez, Tr. 275-76; PX 9, 46. LCM executed a lease with each end-user. Stip. ¶ 15; Methvin, Tr. 159; Perez, Tr. 276; PX 9, 46. The length of these lease agreements was 60 months (five years). PX 9, 46 at 1, 7. Under the terms of the leases, each end-user was to pay $25 per month for the duration of the 60-month term, for a total of $1,500. Id.

In lieu of lease payments, Mr. Kozlovsky gave LCM two vehicles with a combined value of approximately $16,500. Methvin, Tr. 81-82; Perez, Tr. 311. Also in lieu of lease payments, Mr. Haynes provided free labor to RCIAC with a value of approximately $1,600. Methvin, Tr. 163; Perez, Tr. 310. Ms. Pence made lease payments of $800 or $900 to LCM. Methvin, Tr. 160; Pence, Tr. 695. Mr. Sanderlin made two lease payments to LCM. Perez, Tr. 310-11; Sanderlin, Tr. 677.

Under the lease agreements with LCM, each end-user had the option to purchase the systems at the end of the lease term at fair market value or a price specified by LCM. Perez, Tr. 218-19, 278; PX 9, 46 at 1, 8. The lease agreements stated that "[t]he equipment will be deemed to be personal property, regardless of the manner in which it may be attached to any other property. The Lessor [LCM] shall be deemed to have retained title to the equipment at all times, unless the Lessor transfers the title." PX 9, 46 at 8. LCM had the right to repossess the solar systems if an end-user violated the terms of the lease. Methvin, Tr. 159; PX 9 at 3 ("[I]f the Lessee is in default under this Lease . . . Lessor may take possession of the equipment as provided by law"). The lease agreements also

8

contained a merger clause that stated "[t]his Lease constitutes the entire agreement between the parties. No modifications or amendment of this Lease shall be effective unless in writing and signed by both parties. This Lease replaces any and all prior agreements between the parties." PX 9, 46 at 4, 6, 9.

I. LCM's Section 1603 Grant Applications

Between November 2010 and April 2011, LCM submitted Section 1603 applications to Treasury for the 18 solar energy systems. Stip. ¶ 16. All of LCM's Section 1603 applications and documents are included in the evidentiary record. PX 2, 7-30; DX 83-100. The following chart summarizes relevant data for LCM's Section 1603 applications:

| Treasury Application Number | Installation Location | Placed in Service | Claimed Basis | Grant Requested | Grant Awarded | Unit Capacity (KW) |
|---|---|---|---|---|---|---|
| 2011E48SE005737 | Richard Owens (108 Yorkshire) | 8/23/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE005742 | Mark Sanderlin (3611 Greenwood) | 8/11/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE006029 | Paula Pence (131 Glen Knoll) | 9/23/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE007078 | Kozlovsky's Collision Repair (902 S. Kaufman) | 11/15/2010 | $392,333 | $117,700 | $65,356 | 38.22 |
| 2011E48SE007928 | Steve Yoder (6225 Sherbert) | 11/15/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE009570 | Richard Ray (802 Cobblestone) | 12/13/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE009573 | Paul Haynes (716 Shady Creek) | 10/4/2010 | $106,102 | $31,831 | $17,237 | 10.08 |
| 2011E48SE009624 | Richard Ray 516 W. Warrior) | 12/13/2010 | $90,720 | $27,216 | $14,774 | 8.64 |
| 2011E48SE010776 | Richard Ray (1910 Baylor #101) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010774 | Richard Ray (1910 Baylor #102) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |

9

| Treasury Application Number | Installation Location | Placed in Service | Claimed Basis | Grant Requested | Grant Awarded | Unit Capacity (KW) |
|---|---|---|---|---|---|---|
| 2011E48SE010777 | Richard Ray (1910 Baylor #103) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010778 | Richard Ray (1910 Baylor #104) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010779 | Richard Ray (1902 Baylor #103) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010781 | Richard Ray (1902 Baylor #102) | 12/27/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010782 | Richard Ray (2933 Wood Thrush) | 10/1/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE010783 | Richard Ray (307 Bryan) | 11/8/2010 | $90,720 | $27,216 | $14,774 | 8.64 |
| 2011E48SE010784 | Richard Ray (2925 Wood Thrush) | 12/23/2010 | $105,840 | $31,752 | $17,237 | 10.08 |
| 2011E48SE011873 | New Liberty Baptist Church (333 W. Centerville) | 3/30/2011 | $893,235 | $267,971 | $145,282 | 84.96 |

Stip. ¶ 28.

The cost basis that LCM submitted to Treasury for each system was between $10.27 and $10.53 per watt. The per-watt cost basis of each system was consistent with the per-watt cost basis ($10.50) that RCIAC had submitted for the Brandon Oaks system, which Treasury had approved in full in awarding RCIAC a Section 1603 grant.

RCIAC's actual installation costs for material and labor were much less than the retail price. The evidence shows that RCIAC marked up its actual installation costs by a factor of 1.8 to arrive at a retail price. DX 12-18 as supplemented (showing RCIAC's mark ups obtained during discovery). The mark up factor of 1.8 puts the claimed basis in the range of $10.50 per watt that Treasury previously had approved for RCIAC. LCM disclosed its actual installation costs to Treasury on February 10, 2011. PX 46.

The grants that LCM expected to receive, nearly $31,800 from the Treasury and $22,500 from Oncor for a 10.08 kw system, exceeded RCIAC's actual costs of installation. RCIAC's installation cost for each 10.08 kw system was $47,880. PX 46 at 1; Stip. ¶ 24.

10

This fact explains why LCM and RCIAC were not more diligent in pursuing payments from their solar energy system customers. LCM essentially could give away the solar energy systems for no charge, knowing that it would receive its costs and a reasonable profit through the Treasury and Oncor payments, calculated on a retail price basis rather than the actual installation cost. At a retail price of approximately $106,000, and after receipt of the expected $54,300 from the Treasury and Oncor, a balance of approximately $51,800 remained. LCM treated this amount as a rebate which its customers would not have to pay. PX 46 at 1. Nevertheless, despite LCM's laxness in pursuing payments, the Court finds that LCM entered into true leases with its solar energy customers.

With its applications and in response to questions from Treasury, LCM submitted documentation to support the eligibility of the specified energy properties, including the dates the properties were placed in service, and the basis for the claimed cost of the properties. PX 2, 7-30; DX 83-100. LCM supplied Treasury with the executed lease agreements between itself and the end-users. Perez, Tr. 215-16; PX 9. LCM also furnished an opinion letter from David Hall, an attorney and certified public accountant, dated February 10, 2011. Stip. ¶ 20; PX 46.

### J. The Treasury's Grant Awards to LCM

On March 7, March 22, May 9, and May 20, 2011, the Treasury issued its final determinations regarding LCM's 18 grant applications. PX 3-6, 53. In response to each application, the Treasury awarded grant amounts that were less than the amounts sought in LCM's applications. Stip. ¶ 28. The Treasury reduced LCM's grant amounts in all cases because it disagreed with LCM's claimed cost basis. PX 3-6, 53.

The total amount that the Treasury paid LCM for its 18 applications was $482,504. Stip. ¶ 27. LCM claims an additional payment of $407,134, which is the difference between the total amount that LCM submitted to the Treasury ($889,638), and the amount that the Treasury granted ($482,504).

### Standards for Decision

Section 1603 of ARRA provides "grants for specified energy property in lieu of tax credits" and explicitly adopts the meaning of terms used in the Internal Revenue Code, 26 U.S.C. §§ 45 and 48. ARRA § 1603, 123 Stat. 115, 364, 366. When an applicant pursues a Section 45 or 48 tax credit instead of a Section 1603 reimbursement and receives an unfavorable determination by the IRS, the applicant may file a tax refund suit. In tax refund suits, the Court reviews claims *de novo,* and the plaintiff bears the burden of proof for each claim. See, e.g., D'Avanzo v. United States, 54 Fed. Cl. 183, 186 (2002). Similarly, Section 1603 claimants may file suit after an unfavorable determination by the Treasury

Department regarding property that otherwise qualifies for a Section 45 or 48 tax credit. There is no indication in Section 1603 that Congress intended a different standard of review based upon Section 1603's provision of direct reimbursement in lieu of tax credits. Accordingly, the Court reviews LCM's claims *de novo*.

In order for a party to be liable to the Government under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, the Government must establish that a claimant "knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting Commercial Contractors v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); accord Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001); Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 496 (2011). The Government bears the burden of proving its claim by clear and convincing evidence. Kellogg, 99 Fed. Cl. at 496.

"Clear and convincing" evidence presents a relatively high bar for the Government to meet. See Therasense v. Becton, Dickinson & Co., 649 F.3d 1276 (Fed. Cir. 2011) where the Court observed:

> . . . [T]he specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." Star, 537 F.3d at 1366. Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." Kingsdown, 863 F.2d at 873 (emphasis added). Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. See Scanner Techs. Corp. v. ICOS Vision Sys. Corp., 528 F.3d 1365, 1376 (Fed. Cir. 2008).

649 F.3d at 1290-91.

In order to succeed under the False Claims Act, 31 U.S.C. § 3729, the Government must establish that the claimant "knowingly present[ed], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim" or "knowingly present[ed] or cause[d] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)((A)-(B). The Government must not only prove that a party submitted a false claim, but also that the party "had actual knowledge of the falsity of the claim or . . . acted in deliberate ignorance or reckless disregard of the truth or falsity of its claim." Commercial Contractors, 154 F.3d at 1362. The Government must prove the elements of a False Claims Act cause of action by a preponderance of the evidence. Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. 547, 585 (2006), aff'd 557 F.3d 1332 (Fed. Cir. 2009).

Analysis

A. Plaintiff's Claim

Under Section 1603, solar energy property qualifies as property eligible for a rebate. Specified energy property includes "equipment which uses solar energy to generate electricity." 26 U.S.C. § 48(a)(3)(A)(i) (incorporated by reference in § 1603(d)(3). For solar energy property, Section 1603 provides that the amount of the grant shall be 30 percent of the cost basis of the property. § 1603(b)(2)(A). The Government has "no discretion to reimburse an applicant for less than, or more than, thirty percent of the correct basis of the property." ARRA Energy Co. 1, 97 Fed. Cl. at 21.

LCM's 18 solar energy systems qualify as specified energy property under Section 1603. LCM placed each of the 18 solar power systems into service within the time frame specified by Section 1603. See § 1603(a)(1) (property eligible for grant if placed in service "during 2009, 2010, or 2011").

LCM owned each of the 18 systems at all times relevant to this case. The record establishes that RCIAC transferred title to the systems to LCM by oral agreement on or about October 25, 2010. Oral agreements are enforceable under Texas law. See Tex. Bus. & Com. Code Ann. § 26.01 (2015) (agreement to transfer personal property within one year from date of agreement not subject to statute of frauds).

LCM executed an enforceable lease agreement with each end-user under which the system "will be deemed to be personal property" and LCM shall be deemed to have retained title to the equipment at all times. PX 9, 46 at 9; see Monasco v. Gilmer Boating & Fishing Club, 339 S.W.3d 828, 835 (Tex. App. 2011) ("[A]lthough improvements to land usually become part of the land, parties may agree that those improvements are personalty.").

The problem in this case is to determine the reasonable cost basis for the 18 solar power systems. Ordinarily, the Court would give weight to the retail purchase price included in the lease agreement as a purchase option to be charged by the seller and paid by the buyer as establishing the fair market value. In this case, however, LCM charged only nominal monthly lease payments, and it made little effort to collect payments from its power system customers. Essentially, and for the most part, LCM waived the payment provisions in its leases, being content to receive compensation through the Treasury and Oncor grants. The evidence shows that the expected grant payments from Treasury ($31,800) and Oncor ($22,500) exceeded LCM's installation costs of $47,880, and that LCM treated the balance as a rebate that the customers would not have to pay. See PX 46;

13

Stip. ¶ 24. Therefore, the retail purchase prices and payment terms that LCM included in the leases are not meaningful in setting the Section 1603 cost basis.

Yet, the Treasury Department was instrumental in leading LCM to believe that its business plan for the solar power systems would be acceptable. In the very first transaction, where RCIAC used the Brandon Oaks lease as a pilot installation, Treasury approved the full grant amount. RCIAC had used a price based upon $10.50 per watt, and Treasury had found it acceptable, paying a 30 percent grant on this price. Thus, Treasury representatives significantly influenced Mr. Methvin and Mr. Perez in forming the beliefs on which their solar power transactions were based. Treasury's approval of the Brandon Oaks installation at $10.50 per watt led Mr. Methvin and Mr. Perez down this path. Based upon the Brandon Oaks transaction, Mr. Methvin and Mr. Perez reasonably believed that the Section 1603 and Oncor grants would provide adequate compensation, and that they could waive payments from their customers if they so elected.

By LCM's waiving customer payments, however, the Court cannot use the lease prices or retail purchase prices as the cost basis for the Section 1603 grants. The better, more reasonable approach is to use the installation costs of $47,880 per system, plus a twenty percent profit (which is what Treasury did in compensating LCM for its Section 1603 grants). The total cost basis with profit using installation costs then becomes $57,456. Mr. Methvin's and Mr. Perez's companies undeniably incurred these installation costs in providing solar energy power to the customers. The solar energy systems also are undeniably eligible for Section 1603 grants. Awarding LCM a 30 percent grant on the installation costs plus profit yields a total of $17,237 for a 10.08 megawatt system. This grant amount equals the grant amounts that Treasury awarded to LCM. Accordingly, the Court finds that Treasury awarded LCM the proper grant amount, and LCM may retain the $482,504 grant award.

    B.   The Government's Counterclaims

With regard to the Government's counterclaims under 28 U.S.C. § 2514 and 31 U.S.C § 3729, the Court begins by noting again that Mr. Methvin and Mr. Perez are high school graduates with minimal knowledge or experience in the field of solar panel installation. The Government makes much of the fact that Mr. Methvin and Mr. Perez allegedly established LCM as a sham entity with the intent of defrauding the United States. This allegation is completely unfounded. The sole reason that Mr. Methvin and Mr. Perez started LCM was to comply with Treasury and IRS instructions that a single company, as they understood, could not be both the installer and lessor of the same equipment. Absent their understanding of the Treasury and IRS advice, there is no other plausible reason for Mr. Methvin and Mr. Perez to have created LCM.

Mr. Methvin and Mr. Perez both testified at trial, and the Court found them to be highly credible witnesses. The Government had every opportunity to cross-examine them, but was unable to demonstrate the requisite knowledge and intent to support the counterclaims. At most, Mr. Methvin and Mr. Perez created documents in a rather unsophisticated way to make the transactions appear to be similar to the Brandon Oaks installation that Treasury had approved. The evidence on which the Government relies to support false claims and false statements actually are assertions in documents that do not create binding rights and obligations, such as DX 24, 31, 39, 48, 55, 64, 66 and 76, or they are unexecuted and unenforceable purported agreements, such as DX 26, 29, 41, 42, 45, and 72.

The Court flatly rejects the Government's portrayal of Mr. Methvin and Mr. Perez as sophisticated conspirators who set out to perpetrate a complex scheme to defraud the taxpayers. The evidence supports a finding that Mr. Methvin and Mr. Perez were simply trying to act in accordance with what they believed were the requirements of the Section 1603 program.

## Conclusion

Based upon the foregoing, the Court rules that Plaintiff LCM may retain $482,504 awarded under Section 1603, but LCM is not entitled to any additional recovery. Plaintiff's complaint is DISMISSED with prejudice. The Government's fraud counterclaims under 28 U.S.C. § 2514 and 31 U.S.C § 3729 are DENIED. The Clerk is requested to enter judgment that Plaintiff and Defendant each take nothing. No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge